UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
NORTHERN DIVISION

CHARMEL C. ALLEN,

                Plaintiff,

                                        Case Number: 11-10942

v.                                      District Judge Thomas L. Ludington

SHAWNEY, et al.,

                Defendants.

_____/

**OPINION AND ORDER OVERRULING PLAINTIFF'S OBJECTIONS, ADOPTING MAGISTRATE'S REPORT AND RECOMMENDATION, AND GRANTING DEFENDANTS' MOTIONS FOR SUMMARY JUDGMENT**

Plaintiff Charmel C. Allen commenced this case against Defendants Jeffrey Stieve, Craig Hutchinson, and Vijaya Mamidipaka, as well as a plethora of other defendants who have since been dismissed from this case. She alleges that Defendants have violated her Eighth Amendment rights through their deliberate indifference to her medical needs. Her other claims have since been dismissed.

Plaintiff filed her complaint on March 10, 2011. On May 23, 2011, the Court referred the case to United States Magistrate Judge Michael Hluchaniuk for general case management. Plaintiff filed an amended complaint on March 15, 2012.

On September 7, 2012, Defendants Drs. Craig Hutchinson and Vijaya Mamidipaka, among other defendants who have since been dismissed from this case, filed a motion to dismiss for events taking place up to March 31, 2009. On March 28, 2013, Defendants Drs. Craig Hutchinson and Vijaya Mamidipaka, among other defendants who have since been dismissed from this case, filed a motion for summary judgment for events taking place up to March 31, 2009. On April 29, 2013, Defendants Drs. Craig Hutchinson and Vijaya Mamidipaka, among

other defendants who have since been dismissed from this case, filed a motion for summary judgment for events taking place after March 31, 2009. On April 30, 2013, Defendant Dr. Jeffrey Stieve filed a motion for summary judgment.

On May 15, 2013, Judge Hluchaniuk issued a report recommending that the Court deny Defendants' motion to dismiss. *See* Report & Rec., ECF No. 201. On May 30, 2013, Defendants filed their objections to the report. On June 10, 2013, the Court issued an opinion and order adopting the report and recommendation, overruling Defendants' objections, and denying Defendants' motion to dismiss. *See* ECF No. 212.

On November 20, 2013, Judge Hluchaniuk issued a report recommending that the Court grant Defendants' motions for summary judgment. *See* Report & Rec., ECF No. 218. Plaintiff was given fourteen days to file any objections to the report. Plaintiff filed her objections on December 7, 2013, seventeen days later.

Judge Hluchaniuk's report and recommendation is to be reviewed de novo. *See* Fed. R. Civ. P. 72(b)(3). Upon review, Judge Hluchaniuk correctly determined that Defendants were not deliberately indifferent to Plaintiff's medical needs because Plaintiff objectively does not have a sufficiently serious medical need, and Defendants do not have a subjectively sufficiently culpable state of mind for their conduct toward Plaintiff. In addition, Judge Hluchaniuk correctly determined that the Court should grant Defendants' motions for summary judgment. Accordingly, the Court will overrule Plaintiff's objections, adopt Judge Hluchaniuk's report and recommendation, and grant Defendants' motions for summary judgment.

# I

Plaintiff Charmel Allen is a 52-year-old inmate in the custody of the Michigan Department of Corrections at Women's Huron Valley Correctional Facility in Ypsilanti,

Michigan. Pl.'s Am. Compl. ¶ 5, ECF No. 118. She was formerly at Scott Correctional Facility in Plymouth, Michigan, until it closed. *Id.* at ¶ 4. Plaintiff was diagnosed with hepatitis C, hepatitis B, and hepatitis D in 2007 and 2008, a rare and complicated condition. Defs.' First Mot. Summ. J. Ex. N (Bacon Dep.) at 15-17, ECF No. 180; Defs.' Second Mot. Summ. J. Ex. A at Pg ID 4158, 4173, ECF No. 190; Pl.'s Resp. Opp'n Defs.' First Mot. Summ. J. Ex. F (Bacon Expert Report) at 5, ECF No. 188. While at Scott Correctional Facility and Women's Huron Valley Correctional Facility, she received treatment for her hepatitis infections that is the subject of this litigation.

## A

## 1

Dr. Hutchinson, an infectious disease specialist, had his first consultation with Plaintiff on November 18, 2008. Defs.' Second Mot. Summ. J. Ex. A at Pg ID 4172-74, 4288-89. Dr. Hutchinson conducted an Infectious Diseases Telemedicine Consultation to evaluate Plaintiff for hepatitis treatment under the Michigan Department of Corrections (MDOC) Hepatitis C Clinic Management Program. *Id.* at 4173-74; *see* Defs.' Second Mot. Summ. J. Ex. D. Dr. Hutchinson assessed Plaintiff as having chronic hepatitis C genotype 1b, hepatitis B co-infection, and sickle cell trait. Defs.' Second Mot. Summ. J. Ex. A at Pg ID 4173-74. He noted that Plaintiff's hepatitis B co-infection had no features that would predict success with peginterferon, and he noted that Plaintiff's sickle cell trait would preclude a full dose of ribavirin co-administration with peginterferon. *Id.* at Pg ID 4288. In addition, he noted her August 11, 2008, biopsy, which revealed chronic hepatitis C and B with mild piecemeal necrosis (inflammation grade 2) and enlarged fibrotic portal tracts with periportal fibrous septae (fibrosis stage 2). *Id.* at 4250, 4288; Defs.' First Mot. Summ. J. Ex. B (Hutchinson Dep.) at 52. He ordered various hepatitis panels

and ordered her to return for a routine appointment in approximately six weeks. Defs.' Second Mot. Summ. J. Ex. A at Pg ID 4173-74.

On January 2, 2009, Dr. Hutchinson had his second evaluation of Plaintiff. Defs.' Second Mot. Summ. J. Ex. A at Pg ID 4158-59. He noted Plaintiff's hepatitis C infection along with her hepatitis B and hepatitis D co-infections, and he recommended a referral to the University of Michigan hepatology clinic for an opinion regarding treating Plaintiff's hepatitis. He explained to Plaintiff that use of ribavirin to treat her hepatitis C would be essentially contraindicated, and without ribavirin, the chance of successfully treating her hepatitis C would be reduced to close to single digits due to her African-American race and genotype 1b. He also told her that using peginterferon to treat her hepatitis B was possible, but the chance of success was similarly low. Consequently, he recommended a referral to determine whether a course of treatment with peginterferon plus or minus ribavirin was advisable.

**2**

On March 19, 2009, Dr. Hari Conjeevaram at the University of Michigan Liver Outpatient Clinic met with Plaintiff. Defs.' Second Mot. Summ. J. Ex. A at Pg ID 4283-85. He noted that Plaintiff had been referred with a  history of hepatitis B, hepatitis C, and hepatitis D co-infections. He noted that the August 2008 liver biopsy was read as fibrosis stage 2 out of 4, with enlarged fibrous portal tracts and periportal fibrous septae.

He noted that he would initially start her hepatitis C treatment and check what her response would be to the treatment. If treatment with interferon and ribavirin was initiated, and if Plaintiff responded well to the treatment, Dr. Conjeevaram suggested continuing treatment for hepatitis C. Once treatment for hepatitis C was completed, Plaintiff could continue treatment with peginterferon or switch to an oral agent to treat the hepatitis B and D co-infection. These

decisions would depend on her response to the treatment. He would also follow her closely on her complete blood count during treatment, noting that she had sickle cell trait, not sickle cell disease. He noted that if there was any concern, it would not be unreasonable for her to be seen by the hematology department before initiating treatment.

Dr. Conjeevaram also noted in an addendum on April 8 that Plaintiff's liver biopsy slides had been reviewed. They were read as mild chronic hepatitis consistent with viral hepatitis. The slides were read as having bridging fibrosis/early cirrhosis, or an Ishak fibrosis score of 5 out of 6.[1] He noted that he would definitely consider treatment for her viral hepatitis. Dr. Conjeevaram addressed the report to Dr. Mamidipaka, Plaintiff's primary care physician.

**3**

On April 2, 2009, Plaintiff's infectious disease telemedicine consult with Dr. Hutchinson was rescheduled because Dr. Hutchinson was still waiting on the receipt of Dr. Conjeevaram's hepatology consultation report. Defs.' First Mot. Summ. J. Ex. A at Pg ID 3287.

On July 14, 2009, Plaintiff's infectious disease telemedicine consult with Dr. Hutchinson was rescheduled because the telemedicine network was unavailable. Defs.' First Mot. Summ. J. Ex. A at Pg ID 3256. Dr. Hutchinson requested that Dr. Conjeevaram's report be faxed to him, as he had still not received the report.

On October 8, 2009, Plaintiff's infectious disease telemedicine consult with Dr. Hutchinson was rescheduled because of a mobilization at the prison. Defs.' First Mot. Summ. J. Ex. A at Pg ID 3300.

---

[1] A score of 6 out of 6 corresponds to cirrhosis. A score of 5 out of 6 on the Ishak fibrosis staging scale corresponds to a score of 3 out of 4 on the Batts and Ludwig scale used by the Michigan Department of Corrections, in which a score of 4 out of 4 corresponds to cirrhosis. *See* infra p. 6.

On February 9, 2010, Plaintiff's infectious disease telemedicine consult with Dr. Hutchinson was rescheduled because of problems with the electronic medical record system. Defs.' First Mot. Summ. J. Ex. A at Pg ID 3302.

On April 21, 2010, Plaintiff had her third infectious disease telemedicine consult with Dr. Hutchinson. Defs.' First Mot. Summ. J. Ex. A at Pg ID 3214-15. He was fairly sure that ribavirin was contraindicated by Plaintiff's sickle cell trait, but he wanted to know more about treating hepatitis B, D, and C with interferon monotherapy, if that was the recommendation. He still had not received Dr. Conjeevaram's report, and he requested that the report be obtained and faxed to him. He noted that Plaintiff was concerned about pain management and was quite aware that peginterferon would make her pain complaints less tolerable, and may worsen any underlying pain conditions. He noted that Plaintiff appeared relaxed, calm, and comfortable. He recommended a Pain Management Committee referral, and a follow up in six to eight weeks.

On June 16, 2010, Plaintiff's infectious disease telemedicine consult with Dr. Hutchinson was rescheduled because of a power outage at the prison. Defs.' First Mot. Summ. J. Ex. A at Pg ID 3303.

On August 12, 2010, Plaintiff's infectious disease telemedicine consult with Dr. Hutchinson was rescheduled because of problems with the telemedicine system. Defs.' First Mot. Summ. J. Ex. A at Pg ID 3193.

**4**

On August 13, 2010, Plaintiff had her fourth infectious disease telemedicine consult with Dr. Hutchinson. Defs.' First Mot. Summ. J. Ex. A at Pg ID 3193. He had received Dr. Conjeevaram's report and reviewed the report with her. He noted that the 2008 biopsy slides had been reviewed at the University of Michigan medical center in March 2009, and fibrosis was

noted to be bridging in some areas of the biopsy, which could be more consistent with stage 3 out of 4 using the Batts and Ludwig classification system.

Since his last visit with her, the potential and probable availability of a new hepatitis C protease inhibitor had come to his attention. He reviewed that information with her and spoke with her about the common symptoms of Viread (tenofovir) for hepatitis B treatment. He noted that her hepatitis B and D co-infection could result in the suppression of the hepatitis B viral load. He noted that under these circumstances, it was entirely appropriate to use the available antiviral treatment of hepatitis B, get that stabilized, and then decide when would be the appropriate time to treat her hepatitis C. He recommended Viread for treatment of hepatitis B and ordered additional panels for approximately six weeks after the start of her Viread treatment.

On October 27, 2010, Plaintiff had her fifth infectious disease telemedicine consult with Dr. Hutchinson. Defs.' First Mot. Summ. J. Ex. A at Pg ID 3294. He noted that a potential obstacle for treatment for hepatitis C was her sickle cell trait as well as her African-American race, although he noted that he now had the option of assessing her responsiveness to peginterferon with an IL-28B test. He recalled her 2008 liver biopsy with grade 2, stage 2, but noted that it had been over-read in March 2009 as having stage 3+.[2] He noted that Plaintiff, after reading the Physician's Desk Reference and product information, wanted further discussion before starting Viread treatment due to concern with some potential side effects that had been listed. After discussing potential side effects and assuring her that he would monitor her treatment carefully, Plaintiff agreed to start treatment.

On January 6, 2011, Plaintiff had her sixth infectious disease telemedicine consult with Dr. Hutchinson. Defs.' First Mot. Summ. J. Ex. A at Pg ID 3291. He noted that this was a follow

---

[2] This is in contrast to Dr. Hutchinson's previous evaluation, where he noted that the 2009 biopsy had been read as stage 3.

up from her last visit when he cleared Plaintiff to begin treatment with Viread for hepatitis B and D, reserving hepatitis C treatment for future consideration in light of her genotype 1b, African-American race, sickle cell trait precluding the use of ribavirin, and just a general sense of first and simple things first. He noted that Plaintiff had taken the Viread to treat her hepatitis B, but after about five weeks, she had a flare of generalized pain and somehow reached the conclusion that the Viread might be the cause and discontinued use. After she was given pain medication, her condition returned to baseline. He explained to her that if she made hepatitis B treatment contingent on being comfortable, she would essentially not receive any treatment at all. She agreed to restart Viread. He noted that he would have her labs monitored six weeks afterwards and then see him for a review.

On March 22, 2011, Plaintiff had her seventh infectious disease telemedicine consult with Dr. Hutchinson. Defs.' First Mot. Summ. J. Ex. A at Pg ID 3290. Dr. Hutchinson explained that they had done all that was possible to treat Plaintiff's hepatitis B and D infections short of peginterferon, which would be the next step. He recalled her biopsy reading of fibrosis stage 3+. He noted that if she had reached the early stages of cirrhosis, then her compensation was excellent. He also ordered some lab tests, including an IL-28B test, which would give some idea as to the likelihood of successfully treating Plaintiff's hepatitis C infection with the standard treatment course of peginterferon and ribavirin.

On July 1, 2011, Plaintiff had her eighth infectious disease telemedicine consult with Dr. Hutchinson. Defs.' First Mot. Summ. J. Ex. A at Pg ID 3291. He considered the hepatitis B virus suppression mission accomplished except that only a course of peginterferon had the potential of eliminating the hepatitis B infection and thereby eliminate the hepatitis D infection. Regarding Plaintiff's hepatitis C treatment, the IL-28B test revealed a less than 20 percent chance of success

with peginterferon and ribavirin in African-American patients with genotype 1. He therefore recommended waiting for the availability of new hepatitis C treatments, telaprevir and boceprevir, to raise that probability by 20 to 25 percent. He noted that although he did not feel that it was immediately urgent, he did feel more urgency than he would in a patient infected with hepatitis C only.

On October 7, 2011, Plaintiff's infectious disease telemedicine consult with Dr. Hutchinson was rescheduled because of problems with the telemedicine system. Defs.' First Mot. Summ. J. Ex. A at Pg ID 3324.

**5**

On January 20, 2012, Plaintiff had her ninth infectious disease telemedicine consult with Dr. Hutchinson. Defs.' First Mot. Summ. J. Ex. A at Pg ID 3318-20. He noted that she was continuing Viread daily and he discussed options for her next step for treating hepatitis B, C, and D. He told her that the program for delivery of telaprevir and boceprevir in the Department of Corrections was not yet in place, and that once it was in place, it would be likely that priority would be given to patients with cirrhosis, particularly those with some functional compromise of liver function. He doubted that she would get to the head of the line in the next six to twelve months even if it was approved for her case.

He told her that the options available were to proceed with a course of peginterferon with in an effort to eliminate the hepatitis B and D infections. He told her that the probability of success was a good deal less than 30 percent. He also told her that they might as well attempt a course of ribavirin to see if they could eliminate the hepatitis C in the same effort. He estimated that the probability of success for that was 15 percent. He noted that she seemed very anxious to get started and do something rather than just continue waiting for a potential availability of new

treatment options. He told her that at this point, non-formulary requests for boceprevir and telaprevir would not be approved in the near future. However, he noted that she wanted to begin hepatitis C treatment. He recommended peginterferon and ribavirin for 48 weeks, assuming the ribavirin was tolerated and especially if there was a hepatitis C response. At the point where it would appear to be futile to eradicate hepatitis C, and especially if there were ribavirin-induced anemia issues, they could dispense with the ribavirin and focus just on the hepatitis B and D.

After Plaintiff began hepatitis C treatment, Dr. Hutchinson monitored her treatment. *See* Defs.' First Mot. Summ. J. Ex. A at Pg ID 3311, 3334, 3337. On August 26, 2012, Dr. Hutchinson determined that Plaintiff's treatment had failed and stopped treatment accordingly. *See* Defs.' First Mot. Summ. J. Ex. A at Pg ID 3331.

**B**

Dr. Mamidipaka, Plaintiff's primary care physician from 2008 to 2009, evaluated Plaintiff for the first time on July 23, 2008. This was also the first time that Dr. Mamidipaka evaluated and treated Plaintiff's hepatitis. Aside from Plaintiff's chronic hepatitis C genotype 1b, Dr. Mamidipaka noted a normal hepatitis examination, with normal sclera, no splenomegaly, no hepatomegaly, no ascites, no tenderness, no palmer erythema, and no spider angiomata. Defs.' Second Mot. Summ. J. Ex. A at Pg ID 4256.

On September 2, 2008, Dr. Mamidipaka reviewed Plaintiff's medical records and renewed her pain medications. Defs.' Second Mot. Summ. J. Ex. A at Pg ID 4185, 4187.

On September 5, 2008, Dr. Mamidipaka examined Plaintiff and noted that Plaintiff's July 23, 2008, hepatitis labs revealed only mildly elevated liver enzymes. Defs.' Second Mot. Summ. J. Ex. A at Pg ID 4257. Dr. Mamidipaka submitted a request for an infectious disease

consultation with Dr. Hutchinson for evaluation and management of Plaintiff's hepatitis. Defs.' Second Mot. Summ. J. Ex. A at Pg ID 4179-80.

On September 23, 2008, Dr. Mamidipaka reviewed Plaintiff's medical records. She noted that Plaintiff's liver ultrasound and biopsy revealed a lesion in the right lobe, which was likely a hemangioma, but needed confirmation. Defs.' Second Mot. Summ. J. Ex. A at Pg ID 4178. She requested a CT scan of the liver to evaluate the lesion. Defs.' Second Mot. Summ. J. Ex. A at Pg ID 4165-66.

On November 19, 2008, Dr. Mamidipaka noted Dr. Hutchinson's infectious disease consultation report. She followed Dr. Hutchinson's recommendations and requested that Plaintiff follow up with Dr. Hutchinson in six weeks. Defs.' Second Mot. Summ. J. Ex. A at Pg ID 4168-70.

On December 4, 2008, Dr. Mamidipaka saw Plaintiff in the hepatitis clinic. Defs.' Second Mot. Summ. J. Ex. A at Pg ID 4255. Dr. Mamidipaka noted a normal hepatitis examination. She also educated and informed Plaintiff regarding the treatment process.

On December 8, 2008, Plaintiff underwent a CT scan of the abdomen and pelvis. Defs.' Second Mot. Summ. J. Ex. A at Pg ID 4253-54. The CT report confirmed the lesion in the prior ultrasound. The report noted that its findings were compatible with a benign hemangioma. It also noted that there were no other liver lesions, and it made no reference to cirrhosis.

On January 14, 2009, Dr. Mamidipaka submitted an infectious disease consultation request with Dr. Hutchinson as a follow-up visit from Dr. Hutchinson's last visit with Plaintiff on January 2, 2009. Defs.' Second Mot. Summ. J. Ex. A at Pg ID 4138-39. In addition, as directed by Dr. Hutchinson, she submitted a consultation request for Plaintiff to go to the University of

Michigan hepatology clinic for further evaluation. Defs.' Second Mot. Summ. J. Ex. A at Pg ID 4140-41.

On March 4, 2009, Dr. Mamidipaka examined Plaintiff in the hepatitis clinic. Defs.' Second Mot. Summ. J. Ex. A at Pg ID 4249. Dr. Mamidipaka noted a normal hepatitis examination, and she reeducated Plaintiff regarding hepatitis disease.

On March 19, 2009, Plaintiff's lab results revealed a normal complete blood count panel and a normal liver panel except for slightly elevated AST (aspartate transaminase) levels. Defs.' Second Mot. Summ. J. Ex. A at Pg ID 4287.

On March 23, 2009, Plaintiff underwent an abdominal ultrasound due to complaints of abdominal tenderness and swelling. Defs.' Second Mot. Summ. J. Ex. A at Pg ID 4262-63. The ultrasound report noted a known hepatic hemangioma and possible retroperitoneal lymphocele. The examination again revealed a right lobe hemangioma that was not appreciably changed from the last ultrasound. The report noted that the remainder of the liver was unremarkable. The report did not make any remarks regarding cirrhosis.

On May 7, 2009, Dr. Mamidipaka received a copy of Dr. Conjeevaram's report from the University of Michigan hepatology clinic, signed off on the receipt, and placed it in a bin for filing. Defs.' First Mot. Summ. J. Ex. G (Mamidipaka Dep.) at 54-55.

On May 22, 2009, Dr. Mamidipaka completed a chart review and ordered various lab tests, including comprehensive profile, complete blood count with differential and platelets, prothrombin time, partial thromboplastin time, and hepatitis C qualitative tests. Defs.' First Mot. Summ. J. Ex. A at Pg ID 3266, 3267-71.

On June 4, 2009, Dr. Mamidipaka completed a chart review and ordered various lab tests. Defs.' First Mot. Summ. J. Ex. A at Pg ID 3267-69. She also submitted an infectious disease consultation request for Plaintiff to see Dr. Hutchinson for hepatitis C treatment.

On June 16, 2009, Dr. Mamidipaka met with Plaintiff for a parole board review. She noted that Plaintiff had a normal general appearance. Defs.' First Mot. Summ. J. Ex. A at Pg ID 3259-60.

On July 6, 2009, Dr. Mamidipaka increased Plaintiff's pain relief medication after Plaintiff submitted a medical kite stating that she was experiencing relief but wanted an increase in dosage. Defs.' First Mot. Summ. J. Ex. A at Pg ID 3257-58.

Dr. Mamidipaka had no subsequent involvement in Plaintiff's medical care after July 2009 because she was transferred to another facility. Defs.' First Mot. Summ. J. Ex. G (Mamidipaka Dep.) at 54.

## C

According to Defendant Dr. Stieve, he did not provide any direct care to Plaintiff, and his role was limited to his duties as the Michigan Department of Corrections's Chief Medical Officer. Defs.' Third Mot. Summ. J. Ex. A. His only direct involvement was to deny a request for Flexeril on February 5, 2010, and to defer a request for Neurotonin on August 9, 2010. Defs.' Third Mot. Summ. J. Ex. A at Pg ID 4343; Stieve Aff., Pg ID 4326. Dr. Stieve was part of the Pain Management Committee that reviewed Plaintiff's condition periodically. *See* Defs.' Third Mot. Summ. J. Ex. C (Stieve Dep.) at 31.

## II

The standard of review applicable to a magistrate judge's report and recommendation depends on whether a party files objections. The Court need not review portions of a report to

which a party does not object. *Thomas v. Arn*, 474 U.S. 140, 150 (1985). The Court, however, "must determine de novo any part of the magistrate judge's disposition that has been properly objected to. The district judge may accept, reject, or modify the recommended disposition; receive further evidence; or return the matter to the magistrate judge with instructions." Fed. R. Civ. P. 72(b)(3). De novo review requires at least a review of the evidence before the magistrate judge; the Court may not act solely on the basis of a magistrate judge's report and recommendation. *See Hill v. Duriron Co.*, 656 F.2d 1208, 1215 (6th Cir. 1981). If the Court accepts a report and recommendation, the Court is not required to state with specificity what it reviewed; it is sufficient for the Court to state that it engaged in a de novo review of the record. *Lardie v. Birkett*, 221 F. Supp. 2d 806, 807 (E.D. Mich. 2002).

Federal Rule of Civil Procedure 56(a) requires the Court to grant summary judgment if "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." "A fact is 'material' for purposes of a motion for summary judgment where proof of that fact 'would have [the] effect of establishing or refuting one of the essential elements of a cause of action or defense asserted by the parties.'" *Kendall v. Hoover Co.*, 751 F.2d 171, 174 (6th Cir. 1984) (quoting *Black's Law Dictionary* 881 (6th ed. 1979)). The focus of the Court's inquiry must be on "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 251-52 (1986). The Court must draw all justifiable inferences from the evidence in the non-moving party's favor. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986). In addition, the moving party has the burden of showing the absence of a genuine dispute as to any material fact. *Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 157 (1970).

But when the moving party establishes the lack of a genuine dispute as to any material fact, the burden of demonstrating the existence of such a dispute shifts to the non-moving party to come forward with "specific facts showing that there is a genuine [dispute] for trial." *Celotex Corp. v. Catrett*, 477 U.S. 317, 322-232 (1986). The non-moving party must make an affirmative showing with proper evidence and must "designate specific facts in affidavits, depositions, or other factual material showing 'evidence on which the jury could reasonably find for the [non-moving party].'" *Brown v. Scott*, 329 F. Supp. 2d 905, 910 (E.D. Mich. 2004) (quoting *Anderson*, 477 U.S. at 252). In order to fulfill this burden, the non-moving party need only meet the minimal standard that a reasonable jury could find in its favor. *Anderson*, 477 U.S. at 248. However, mere allegations or denials in the non-moving party's pleadings will not satisfy this burden, nor will the "mere existence of a scintilla of evidence" be sufficient. *Id.* at 248, 252.

### III

Plaintiff made two objections to Judge Hluchaniuk's report and recommendation (R&R). First, Plaintiff argues that the R&R erroneously focused on the form of Plaintiff's expert report by Dr. Bruce Bacon and excluded it despite its admissible contents. Second, Plaintiff argues that, in finding that Plaintiff failed to meet either the objective or the subjective prongs of the deliberate indifference standard, for each Defendant the R&R failed to construe the evidence and to make all reasonable inferences in favor of Plaintiff, and improperly weighed the evidence and made factual determinations.

### A

As an initial matter, Drs. Hutchinson and Mamidipaka contend that Plaintiff's objections to the R&R may be untimely and thus waived. *See* Defs.' Resp. Pl.'s Objs. Report & Rec. 3-6, ECF No. 220. In particular, Drs. Hutchinson and Mamidipaka argue that a report and

recommendation is not a document that is "served" under Federal Rule of Civil Procedure 5(a)(1), and thus, cannot be considered be served under Rule 5(b)(2)(C), (D), (E), or (F). Consequently, they argue, the three-day extension authorized by Rule 6(d) is inapplicable here.

This is a novel but ultimately unavailing argument. Rule 5(a)(1) speaks of "each of the following papers" that "must be served on every party," thus contemplating papers that are outside of the purview of Rule 5(a)(1). Rule 5(b) contains no such limitation, merely stating that "[a] paper is served under this rule by" a list of various means, including electronic means, as was done here. *See* Fed. R. Civ. P. 5(b)(2)(E). Rule 6(d), which applies to electronic service, also contains no limitation on the types of papers it applies to and merely points to "Rule 5(b)(2)(C), (D), (E), or (F)." Additionally, the 1983 advisory committee notes to Rule 72 provide that the additional three-day period of former Rule 6(e) applies to the 14-day (formerly 10-day) period for filing objections to a magistrate's R&R. Fed. R. Civ. P. 72, 1983 advisory committee notes, subdivision (b). Furthermore, numerous circuit court cases have discussed the timeliness of objections while assuming as a matter of course that the additional three-day period prescribed by former Rule 6(e) applies. *See, e.g.*, *Greathouse v. Colo. State Bank*, 73 F.3d 373 (10th Cir. 1996) (unpublished table opinion); *CNPq-Conselho Nacional de Desenvolvimento Cientifico e Technologico v. Inter-Trade, Inc.*, 50 F.3d 56, 58 (D.C. Cir. 1995); *IUE AFL-CIO Pension Fund v. Herrmann*, 9 F.3d 1049, 1054 (2d Cir. 1993). Thus, when a magistrate judge's report and recommendation is served on the parties through electronic means in accordance with Rule 5(b)(2)(E), Rule 6(d) applies, and three days are added to the usual 14-day period.

Turning to the timeliness of Plaintiff's objections, the R&R was issued on November 20, 2013, through the Electronic Case Filing system. Counting from November 21, *see* Fed. R. Civ. P. 6(a)(1)(A), 17 days are added. This arrives at the date of December 7. But because December

7 is a Saturday, "the period continues to run until the end of the next day that is not a Saturday, Sunday, or legal holiday," Fed. R. Civ. P. 6(a)(1)(C), which would be Monday, December 9. Thus, Plaintiff had until December 9 to timely file her objections. Plaintiff filed her objections on December 7, and therefore her objections are timely.

### B

Plaintiff has objected to the R&R's finding that Dr. Bacon's expert report is inadmissible. Generally, a court may not consider inadmissible evidence on a motion for summary judgment. *Alpert v. United States*, 481 F.3d 404, 409 (6th Cir. 2007). However, a non-moving party need not "produce evidence in a form that would be admissible at trial in order to avoid summary judgment." *Celotex Corp. v. Catrett*, 477 U.S. 317, 324 (1986); *Alexander v. CareSource*, 576 F.3d 551, 558 (6th Cir. 2009); *cf.* Fed. R. Civ. P. 56(c)(2) ("A party may object that the material cited to support or dispute a fact *cannot* be presented in a form that would be admissible in evidence." (emphasis added)). The relevant inquiry is whether the evidence submitted in non-admissible form during the summary judgment stage "will be reduced to admissible form at trial." *DeBiasi v. Charter Cnty. of Wayne*, 537 F. Supp. 2d 903, 911 (E.D. Mich. 2008) (quoting *McMillian v. Johnson*, 88 F.3d 1573, 1584 (11th Cir. 1996)); *see* 11 James W. Moore et al., *Moore's Federal Practice* § 56.91[2], [3] (3d ed. 1999) (discussing inadmissible content versus inadmissible form).

The R&R suggested that Dr. Bacon's unsworn expert report was inadmissible hearsay. Plaintiff objects, arguing that the R&R focused on the form rather than the admissible content of the evidence. Plaintiff cites to *McGuire v. Michigan Department of Community Health*, 526 F. App'x 494 (6th Cir. 2013), in support. In *McGuire*, the court found that a letter from the doctor

of the plaintiff, the non-moving party, though not in admissible form, was likely to have admissible content, and thus should not have been excluded by the district court. *Id.* at 496-97.

The R&R, as well as Defendants Hutchinson and Mamidipaka, cite to *Sigler v. American Honda Motor Co.*, 532 F.3d 469 (6th Cir. 2008), for the proposition that an unsworn expert report is hearsay and thus inadmissible. However, *Sigler* is inapplicable because there, it was the moving party that offered the unsworn expert reports in support of its motion for summary judgment. Here, Plaintiff, the non-moving party, is offering an unsworn expert report in opposition to Defendants' motion for summary judgment. Thus, *Celotex*'s more lenient standard for non-moving parties applies. *See Celotex*, 477 U.S. at 324. In addition, since *Sigler*, Rule 56 has been substantially amended and revised, and subdivision (e) of the former Rule 56, which governed the admissibility of evidence for purposes of summary judgment, has been largely omitted. *See, e.g.*, Fed. R. Civ. P. 56 advisory committee notes, 2010 amendments, subdivision (c) ("Subdivision (c) is new. . . . Subdivision (c)(4) carries forward some of the provisions of former subdivision (e)(1). Other provisions are relocated or omitted.").

Because the form of Dr. Bacon's report does not bar its admission, the focus of the inquiry turns to whether its content could be admissible. Clearly, Dr. Bacon is qualified to give his opinion regarding Plaintiff's condition. Dr. Bacon's expert report would be inadmissible at trial, but the contents of the report, that is, Dr. Bacon's opinion, will be admissible assuming that Dr. Bacon will be available to testify at trial. *See* Fed. R. Evid. 802. There is no indication that Dr. Bacon will be unavailable to testify, and thus, Dr. Bacon's opinion is generally admissible for purposes of summary judgment.

**C**

Plaintiff also objects to the R&R's finding that Plaintiff cannot meet either the objective or subjective components of her deliberate indifference claim with regard to each Defendant, arguing that the R&R failed to construe the evidence and to make all reasonable inferences in favor of Plaintiff, and improperly weighed the evidence and made factual determinations.

The Eighth Amendment prohibits cruel and unusual punishment. At the time of its adoption, these included draconian punishments such as the rack, thumbscrews, "tortures[,] and other barbarous methods of punishment." *Gregg v. Georgia*, 428 U.S. 153, 170 (internal quotation marks omitted) (citing Anthony F. Granucci, *"Nor Cruel and Unusual Punishments Inflicted": The Original Meaning*, 57 Calif. L. Rev. 839, 842 (1969)); *Atkins v. Virginia*, 536 U.S. 304, 349 (2002) (Scalia, J., dissenting). Since then, Eighth Amendment jurisprudence has not remained static, but instead has been subject to "the evolving standards of decency that mark the progress of a maturing society." *Trop v. Dulles*, 356 U.S. 86, 100 (1958). In particular, the Supreme Court has recognized that one such standard is the requirement that prison officials "provide medical care for those whom it is punishing by incarceration." *Estelle v. Gamble*, 429 U.S. 97, 103 (1976). This includes a prohibition against deliberate indifference to a prisoner's serious medical needs. *Id.* at 104.

To demonstrate a claim of deliberate indifference, a plaintiff must meet an objective component and a subjective component. *Farmer v. Brennan*, 511 U.S. 825, 837 (1994). First, she must show that she has an objectively "sufficiently serious" medical need. *Blackmore v. Kalamazoo Cnty.*, 390 F.3d 890, 895 (6th Cir. 2004) (quoting *Farmer*, 511 U.S. at 834). Second, she must show that the prison official had a subjectively "sufficiently culpable state of mind." *Id.* (quoting *Farmer*, 511 U.S. at 834).

**1**

In determining whether a plaintiff has a sufficiently serious medical need, courts have taken two nonexclusive paths. A medical need is sufficiently serious if it is "one that has been diagnosed by a physician as mandating treatment or one that is so obvious that even a lay person would easily recognize the necessity for a doctor's attention." *Blackmore v. Kalamazoo Cnty.*, 390 F.3d 890, 895 (6th Cir. 2004) (quoting *Gaudreault v. Municipality of Salem*, 923 F.2d 203, 208 (1st Cir. 1990) (citing *Monmouth Cnty. Corr. Institutional Inmates v. Lanzaro*, 834 F.2d 326 (3d Cir. 1987))). Alternatively, a medical need is sufficiently serious if a plaintiff "place[s] verifying medical evidence in the record . . . establish[ing] the detrimental effect of the delay in medical treatment." *Napier v. Madison Cnty.*, 238 F.3d 739, 742 (6th Cir. 2001) (quoting *Hill v. DeKalb Reg'l Youth Det. Ctr.*, 40 F.3d 1176, 1188 (11th Cir. 1994), *overruled in part on other grounds by Hope v. Pelzer*, 536 U.S. 730 (2002)); *Blackmore*, 390 F.3d at 895 (citing *Napier*) ("*Napier* applies where the plaintiff's 'deliberate indifference' claim is based on the prison's failure to treat a condition adequately, or where the prisoner's affliction is seemingly minor or non-obvious.").

Plaintiff's claim can be broken into three different time periods: first, up until April 2009, when Dr. Conjeevaram issued his amended report; second, from April 2009 to August 2010, when Dr. Hutchinson received Dr. Conjeevaram's report and initiated treatment (for hepatitis B rather than hepatitis C); and third, from August 2010 to January 2012, when Dr. Hutchinson initiated treatment for Plaintiff's hepatitis C infection.

Hepatitis C can be a serious medical condition mandating treatment. However, not all cases of hepatitis C require treatment.[3] In Plaintiff's case, for the first time period, it is

---

[3] Plaintiff points to the Court's previous opinion in this case, ECF No. 212, for the proposition that hepatitis C is a serious medical condition that always requires treatment. *See* Pls.' Objs. Report & Rec. 16, ECF No. 219. However,

undisputed that Plaintiff's fibrosis was at stage 2. There is no evidence to suggest that stage 2 fibrosis requires urgent treatment, and in fact, Plaintiff's expert Dr. Bacon agrees that stage 2 fibrosis does not require urgent treatment. *See* Defs.' Second Mot. Summ. J. Ex. H at 58.

For the second and third time periods, Dr. Conjeevaram's report noted that Plaintiff's liver biopsy slides were read as having an Ishak score of 5 out of 6. Defs.' Second Mot. Summ. J. Ex. A at Pg ID 4285. This corresponds to a score of 3 out of 4 on the Batts and Ludwig scale used by the Michigan Department of Corrections. *See* Defs.' Second Mot. Summ. J. Ex. A at Pg ID 3185. However, even assuming Plaintiff has stage 3 fibrosis, Dr. Zawitz opines that stage 3 fibrosis does not require urgent treatment. Defs.' Second Mot. Summ. J. Ex. E (Zawitz Dep.) at 89-90. In fact, Dr. Conjeevaram states that "my letter did not specifically state that [Plaintiff's] Chronic Hepatitis C must be treated urgently or immediately." Defs.' First Mot. Summ. J. Ex. M (Conjeevaram Aff.) at 3. Plaintiff has not offered any evidence to counter Dr. Zawitz's or Dr. Conjeevaram's opinion that stage 3 fibrosis does not require urgent treatment.

Plaintiff also argues that the delay in treatment from April 2009 to August 2010, or alternatively to January 2012, had a detrimental effect on her condition. Dr. Bacon in his deposition did not state that Plaintiff's disease has progressed due to the delay in treatment, and he only reports that it "is likely [Plaintiff] has had some disease progression." Pl.'s Resp. Opp'n Defs.' First Mot. Summ. J. Ex. F (Bacon Expert Report) at 5. As the R&R suggests, this is too conclusory and equivocal to be more than a scintilla of evidence, *see Anderson*, 477 U.S. at 248, and is so vague as to be unlikely to be helpful to a fact finder, *see* Fed. R. Evid. 702. Plaintiff "must do more than simply show that there is some metaphysical doubt as to the material facts," *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986); she must place

---

that was in the context of "hepatitis C and cirrhosis." Although Plaintiff's pleadings alleged that Plaintiff has cirrhosis, the evidence in the record reveals that Plaintiff does not have cirrhosis. *See supra* p. 5.

"verifying medical evidence" of a detrimental effect of delay, *Napier*, 238 F.3d at 742. Plaintiff has done no such thing. She has not identified any biopsies, ultrasounds, blood tests, consultation notes, examination notes, or any other record in the evidence suggesting that she has suffered a harm due to the delay. To the contrary, lab results from 2012 suggest her liver function is still normal, *see* Defs.' First Mot. Summ. J. Ex. A at Pg ID 3352-54, and a FibroSURE test from October 2012 indicates stage F1-F2 out of a maximum of F4, or fibrosis between "portal fibrosis" and "bridging fibrosis with few septa," *see* Defs.' First Mot. Summ. J. Ex. A at Pg ID 3355. Ultimately, Plaintiff has not demonstrated that she has a sufficiently serious medical need.

**2**

Because Plaintiff has not shown that there was a "sufficiently serious" medical need, her claim fails, and Defendants are entitled to judgment as a matter of law. *See Celotex*, 477 U.S. at 322-23. But even if she could show that she objectively has a sufficiently serious medical need, Plaintiff has failed to show that any of the defendants had a subjectively sufficiently culpable state of mind.

In determining whether a prison official has a sufficiently culpable state of mind, a plaintiff must show more than "mere negligence," but need not show intent. *Farmer*, 511 U.S. at 835. Instead, she must show that the official is "aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inference." *Id.* This is equivalent to a criminal recklessness standard. *See id.* at 837; *see also id.* at 838 (citing with approval Model Penal Code § 2.02(2)(c)) ("[T]o act recklessly . . . a person must 'consciously disregar[d]' a substantial risk of serious harm."); *Gibson v. Foltz*, 963 F.2d 851, 853 (6th Cir. 1992) ("Obduracy or wantonness, not inadvertence or good faith error, characterizes deliberate indifference."). "Thus, to prove the required level of culpability, a plaintiff must show

that the official: (1) subjectively knew of a risk to the inmate's health, (2) drew the inference that a substantial risk of harm to the inmate existed, and (3) consciously disregarded that risk." *Jones v. Muskegon Cnty.*, 625 F.3d 925, 941 (6th Cir. 2010).

A delay in access to medical attention is actionable when it is "tantamount to 'unnecessary and wanton infliction of pain.'" *Hill v. DeKalb Reg'l Youth Det. Ctr.*, 40 F.3d 1176, 1188 (11th Cir. 1994), *overruled in part on other grounds by Hope v. Pelzer*, 536 U.S. 730 (2002) (quoting *Estelle v. Gamble*, 429 U.S. 97, 104 (1976)). In addition, a plaintiff's constitutional rights are violated when medical treatment rendered is "so woefully inadequate as to amount to no treatment at all." *Westlake v. Lucas*, 537 F.2d 857, 860 n.5 (6th Cir. 1976); *see, e.g.*, *Williams v. Vincent*, 508 F.2d 541, 544 (2d Cir. 1974) (telling prisoner "he did not need his ear," throwing prisoner's severed ear away in front of him, and stitching the stump may be attributable to "deliberate indifference . . . rather than an exercise of professional judgment"). Although a plaintiff must show that the official subjectively knew of a substantial risk, this "question of fact [is] subject to demonstration in the usual ways, including inference from circumstantial evidence, . . ., and a factfinder may conclude that a prison official knew of a substantial risk from the very fact that the risk was obvious." *Farmer*, 511 U.S. at 842.

### a

Plaintiff contends that Dr. Hutchinson is sufficiently culpable because he delayed treating her hepatitis C. Plaintiff's argument can be broken into the same timelines as above: first, up until April 2009, when Dr. Conjeevaram issued his amended report; second, from April 2009 to August 2010, when Dr. Hutchinson received Dr. Conjeevaram's report and initiated treatment (for hepatitis B rather than hepatitis C); and third, from August 2010 to January 2012, when Dr. Hutchinson initiated treatment for Plaintiff's hepatitis C infection.

Regarding the first period, Plaintiff does not contend that Dr. Hutchinson was sufficiently culpable before April 2009, and thus the Court will not review this period.

Regarding the second time period, Plaintiff argues that *Farmer* allows fact finders to conclude that "a prison official knew of a substantial risk from the very fact that the risk is obvious." Pls.' Objs. Report & Rec. at 8 (quoting *Farmer*, 511 U.S. at 842). Plaintiff is correct in stating the rule, but she misapplies the rule when she argues that "it may become clear to the reasonable factfinder that Dr. Hutchinson's subjective awareness of Plaintiff's medical needs was obvious." *See* Pls.' Objs. Report & Rec. at 9-10. The relevant inquiry is on the obviousness of the risk, not the obviousness of the prison official's awareness of the risk. In any event, there is no evidence to suggest that a lay person would be able to distinguish between a person having stage 2 fibrosis versus stage 3 fibrosis, or even between fibrosis and cirrhosis. And there is no evidence suggesting that stage 3 fibrosis is an obvious risk even to medical experts. To the contrary, the evidence in the record suggests that stage 3 fibrosis does not require urgent treatment. Defs.' Second Mot. Summ. J. Ex. E (Zawitz Dep.) at 89-90; Defs.' First Mot. Summ. J. Ex. M (Conjeevaram Aff.) at 3. It is obvious, then, that the risk here is not obvious.

Plaintiff also argues that a reasonable fact finder could find from Dr. Hutchinson's failure to request a copy of Dr. Conjeevaram's report more than twice, and his failure to schedule an urgent consultation with Plaintiff despite his authority to do so, that Dr. Hutchinson had a sufficiently culpable state of mind. This essentially turns on whether Plaintiff's condition was sufficiently serious. Stage 2 fibrosis does not require urgent treatment, nor does stage 3. There is no reason why Dr. Hutchinson would expedite a report for a condition that is not urgent. Nor is there a reason why Dr. Hutchinson would use his authority to schedule urgent consultations to schedule an appointment with Plaintiff when her condition was not urgent. Plaintiff also argues

that her rare combination of hepatitis infections should have required Dr. Hutchinson to be more cautious in his care of her medical needs. But similarly, even though Plaintiff does have a rare combination of hepatitis infections, there is no evidence to suggest that her condition urgently required treatment.[4] Thus, Plaintiff has failed to show that Dr. Hutchinson had a sufficiently culpable state of mind during the second period.

Regarding the third time period, Dr. Bacon opines that Dr. Hutchinson should have followed Dr. Conjeevaram's recommendation to begin hepatitis C treatment first instead of hepatitis B treatment. Pl.'s Resp. Opp'n Defs.' First Mot. Summ. J. Ex. F (Bacon Expert Report) at 5. Dr. Hutchinson contends that he appropriately exercised his professional medical judgment in determining when and how to treat Plaintiff. Defs.' First Mot. Summ. J. 18. For example, Dr. Hutchinson explained that he treated Plaintiff's hepatitis B first because he believed she would be better able to tolerate treatment for hepatitis B than hepatitis C. Defs.' Second Mot. Summ. J. Ex. B (Hutchinson Dep.) at 94-95. He additionally believed that it would be better to wait for some much more effective hepatitis C drugs that were likely to be approved by the FDA in the near future. *Id.* This is consistent with the record: given that Plaintiff complained of pain and had worries about the pain that peginterferon would cause, *see* Defs.' First Mot. Summ. J. Ex. A at Pg ID 3214, Dr. Hutchinson decided to treat the hepatitis B first, which could be treated with tenofovir (Viread) rather than peginterferon, *see* Defs.' First Mot. Summ. J. Ex. A at Pg ID 3185. Additionally, Dr. Chad Zawitz in his expert report opines that Dr. Hutchinson complied with the standard of care for treating patients with hepatitis infections. Defs.' First Mot. Summ. J. Ex. K (Zawitz Expert Report) at 17.

---

[4] There is evidence that Dr. Hutchinson was indeed acting more cautiously due to Plaintiff's condition. Dr. Hutchinson noted in his July 1, 2011, infectious diseases telemedicine consultation note that "[a]lthough I don[']t feel that it's immediately urgent, I do feel more urgency than I would in a patient with hepatitis C mono-infection." Defs.' First Mot. Summ. J. Ex. A at Pg ID 3151.

Viewing the evidence in the light most favorable to Plaintiff, the evidence in the record merely shows that there was a difference in medical opinion between Dr. Hutchinson and Dr. Conjeevaram. "Plaintiff's argument that this was no mere difference of medical opinion" is nothing more than a bare assertion. *See* Pls.' Objs. Report & Rec. at 10. Plaintiff cites to statements from Drs. Hutchinson and Zawitz in support, but these statements merely repeat what Dr. Conjeevaram said in his report; Drs. Hutchinson and Zawitz do not specifically say that they themselves believe that treating Plaintiff's hepatitis B first was inappropriate. *See* Defs.' Second Mot. Summ. J. Ex. B (Hutchinson Dep.) at 93; Ex. K (Zawitz Expert Report) at 7.

"[P]rison officials who act reasonably cannot be found liable under the Cruel and Unusual Punishments Clause." *Farmer*, 511 U.S. at 845. Moreover, "[w]here a prisoner has received some medical attention and the dispute is over the adequacy of the treatment, federal courts are generally reluctant to second guess medical judgments and to constitutionalize claims which sound in state tort law." *Westlake*, 537 F.2d at 860 n.5; *see Thomas v. Coble*, 55 Fed. App'x 748, 749 (6th Cir. 2003) ("[The plaintiff] and Dr. Coble clearly disagreed over the preferred medication to treat [the plaintiff's] pain. However, this difference of opinion does not support an Eighth amendment claim."). Because Plaintiff has shown nothing more than a difference in medical opinion, Plaintiff cannot show that Dr. Hutchinson had a sufficiently culpable state of mind for the third time period.

In sum, Plaintiff has not shown that Dr. Hutchinson acted in a reckless manner during any period applicable to this case such that a reasonable fact finder could find him to be sufficiently culpable for a claim of deliberate indifference.

**b**

Plaintiff contends that Dr. Mamidipaka was also deliberately indifferent to her medical needs. The objective prong having been discussed above, the Court turns to whether Dr. Mamidipaka was subjectively sufficiently culpable in her interactions with Plaintiff.

Plaintiff argues that Dr. Mamidipaka could be found sufficiently culpable by a reasonable fact finder because Dr. Mamidipaka had read Dr. Conjeevaram's report and yet "ignored the recommendations of the specialist whom Dr. Hutchinson had sent Plaintiff to see, despite being the named recipient on the recommendation, and subsequent addendum, from the University of Michigan." Pl.'s Objs. Report & Rec. 23. However, after receiving the report, Dr. Mamidipaka requested that Dr. Hutchinson, the infectious disease specialist, consult with Plaintiff. Defs.' First Mot. Summ. J. Ex. G (Mamidipaka Dep.) at 58; Ex. A at Pg ID 3268-69. Plaintiff also does not dispute that Dr. Mamidipaka was following Dr. Hutchinson's recommendations in treating Plaintiff, *see* Defs.' First Mot. Summ. J. Ex. G (Mamidipaka Dep.) at 59, nor does Plaintiff dispute that Dr. Mamidipaka did not have the knowledge to decide whether Plaintiff needed treatment or when Plaintiff should receive treatment, *see* Defs.' First Mot. Summ. J. Ex. G (Mamidipaka Dep.) at 79-80. Although Dr. Hutchinson stated that a primary care physician like Dr. Mamidipaka could implement treatment herself, he noted that such action would be contrary to the procedures in the Michigan Department of Corrections hepatitis C clinical management program. Defs.' First Mot. Summ. J. Ex. C (Hutchinson Dep.) at 33. Additionally, there is nothing in the record to suggest that Dr. Mamidipaka could have or should have continued following up with Dr. Hutchinson after she ceased being Plaintiff's primary care physician, and it is reasonable for her to presume that Plaintiff's new primary care physician would address Plaintiff's medical needs, including any necessary and appropriate follow up with Dr.

Hutchinson. Consequently, Plaintiff has not shown that Dr. Mamidipaka acted in a reckless manner such that a reasonable fact finder could find her to be sufficiently culpable for a claim of deliberate indifference.

**c**

In order to demonstrate liability under 42 U.S.C. § 1983, a plaintiff must show that a prison official acted under color of state law and that the official's actions deprived her of her rights secured by the Constitution or laws of the United States. *Baker v. McCollan*, 443 U.S. 137, 140 (1979). A plaintiff must make a clear showing that the official was personally involved in the activity that forms the basis of the complaint. *Rizzo v. Goode*, 423 U.S. 362 (1976). In addition, liability under § 1983 must be based on active unconstitutional behavior rather than a "mere failure to act." *Salehpour v. Univ. of Tenn.*, 159 F.3d 199, 206 (6th Cir. 1998). Thus, liability cannot be premised on a theory of respondeat superior, *Bellamy v. Bradley*, 729 F.2d 416, 421 (6th Cir. 1984); *see Monell v. Dep't of Soc. Servs. of N.Y.*, 436 U.S. 658, 691 (1978), nor is mere awareness of a complaint of allegedly illegal action sufficient, *Poe v. Haydon*, 853 F.2d 418, 429 (6th Cir. 1988); a plaintiff must show that the official implicitly authorized, approved, or knowingly acquiesced in the unconstitutional conduct of the offending subordinate. *Bellamy*, 729 F.2d at 421. However, a denial of a request to receive medical care may possibly be sufficient involvement for liability to attach. *See, e.g.*, *Martin v. Harvey*, 14 F. App'x 307, 309 (6th Cir. 2001).

Government officials are entitled to qualified immunity from civil damages unless their conduct violates clearly established statutory or constitutional rights of which a reasonable official would have known. *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1983). A court must ask two questions to determine whether a government official is entitled to qualified immunity.

*Saucier v. Katz*, 533 U.S. 194, 201 (2003). First, viewing the evidence in the light most favorable to the party asserting injury, do the facts show that the official's conduct violated a constitutional right? *Id.* Second, was that right clearly established? *Id.* These two steps may be asked in any order. *Pearson v. Callahan*, 555 U.S. 223, 236 (2009). The burden is on the plaintiff to show that the official is not entitled to qualified immunity. *Rich v. City of Mayfield Heights*, 955 F.3d 1092, 1095 (6th Cir. 1992). An analysis of deliberate indifference is equivalent to an analysis of the first prong of the qualified immunity test—whether there was a violation of a constitutional right. *See Phillips v. Roane Cnty.*, 534 F.3d 531, 539 (6th Cir. 2008); *Derfiny v. Pontiac Osteopathic Hosp.*, 106 F. App'x 929, 934-35 (6th Cir. 2004).

In this case, Dr. Stieve performed a chart review in July 2010 for purposes of Plaintiff's pain management plan. *See* Defs.' Third Mot. Summ. J. Ex. A at Pg ID 4346, ECF No. 196. Dr. Stieve has been involved in Plaintiff's pain management, but Plaintiff's Eighth Amendment claim based on her pain has been dismissed by stipulation and order. ECF No. 217. Plaintiff notes that Dr. Stieve's administrative progress note for his chart review indicates that Dr. Stieve referred to "AD CONS ID," or an infectious disease consultation from Dr. Hutchinson dated April 21, 2010. Pl.'s Objs. Report & Rec. 20; *see* Defs.' Third Mot. Summ. J. Ex. A at Pg ID 4344; Pl.'s Resp. Opp'n Defs.' First Mot. Summ. J. Ex. C (Stieve Dep.) at 19. Thus, Plaintiff contends, Dr. Stieve was personally aware that Plaintiff had met with Dr. Conjeevaram in March 2009 at the University of Michigan hepatology clinic and that as of April 2010, Dr. Hutchinson still had not seen Dr. Conjeevaram's report. Pl.'s Objs. Report & Rec. 20-21. Plaintiff also notes that Dr. Stieve frequently communicates with Dr. Hutchinson regarding whether specialist advice would be helpful. *Id.* at 21; Pl.'s Resp. Opp'n Defs.' First Mot. Summ. J. Ex. C (Stieve Dep.) at 53.

At most, Plaintiff has shown that Dr. Stieve had personal knowledge of Plaintiff's situation. Plaintiff has not shown that Dr. Stieve had any clinical involvement in Plaintiff's hepatitis treatment. Thus, even assuming Dr. Hutchinson acted with deliberate indifference toward Plaintiff, Plaintiff has shown only that Dr. Stieve was aware and failed to act, which is insufficient. *See Salehpour*, 159 F.3d at 206; *Poe*, 853 F.2d at 429. Thus, Dr. Stieve does not have the requisite personal involvement to be liable under § 1983.

Moreover, even assuming Dr. Stieve was personally involved in Plaintiff's care, Plaintiff has not shown that Dr. Stieve was sufficiently culpable in his conduct toward her to have violated her constitutional rights. Dr. Stieve in his deposition states that he cannot recall whether he had read Dr. Conjeevaram's report. Pl.'s Resp. Opp'n Defs.' First Mot. Summ. J. Ex. C (Stieve Dep.) at 57. Assuming that during his chart review in July 2010 Dr. Stieve had read the report and was aware of its recommendation to begin treatment, the delay from July 2010 to August 2010, when Dr. Hutchinson began treating Plaintiff, is not an undue delay. In addition, the delay from August 2010 to January 2012 in treating Plaintiff's hepatitis C stems from a difference in medical opinion, which is insufficient to show sufficiently culpable conduct. Thus, Plaintiff has not shown that Dr. Stieve acted in a reckless manner such that a reasonable fact finder could find him to be sufficiently culpable for a claim of deliberate indifference.

**IV**

Viewing the evidence in the light most favorable to Plaintiff, Plaintiff has not rebutted Defendants' showing that there is no genuine dispute of material fact on Plaintiff's claim of deliberate indifference to her medical needs, and thus, Defendants are entitled to judgment as a matter of law. Accordingly:

It is **ORDERED** that Plaintiff's objections to the report and recommendation, ECF No. 219, is **OVERRULED**.

It is further **ORDERED** that the magistrate judge's report and recommendation, ECF No. 218, is **ADOPTED**.

It is further **ORDERED** that Defendants' motions for summary judgment, ECF Nos. 180, 190, and 196, are **GRANTED**.

It is further **ORDERED** that Plaintiff's amended complaint, ECF No. 118, is **DISMISSED** with prejudice.


                                                    s/Thomas L. Ludington
                                                    THOMAS L. LUDINGTON
                                                    United States District Judge
Dated: March 18, 2014


<div style="border:1px solid black">

**PROOF OF SERVICE**

The undersigned certifies that a copy of the foregoing order was served upon each attorney or party of record herein by electronic means or first class U.S. mail on March 18, 2014.

                    s/Tracy A. Jacobs
                    TRACY A. JACOBS

</div>